FRENCH MUT. GENERAL SOCIETY OF MUTUAL INSURANCE AGAINST THEFT v. UNITED STATES FIDELITY & GUAR-ANTY CO. OF BALTIMORE CITY.

(District Court, D. Maryland. March 25, 1913.)

1. JUDGMENT (§ 831*)—FOREIGN JUDGMENTS—VALIDITY—PROCESS—SERVICE—NECESSITY.

A judgment obtained in France without proper service on defendant in that country is a nullity.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1519–1522; Dec. Dig. § 831.*]

2. INSURANCE (§ 684*)—REINSURANCE—LIABILITY ON POLICY.

A French brokers' society insured each of its members against three-fourths of any loss through embezzlement by an employé, not exceeding 1,333,333 francs. Reinsurance was effected in plaintiff company, which, in turn, obtained reinsurance in several companies, including defendant, for shares of the risk. From time to time during the carrying of the original risk there were substitutions of plaintiff's reinsurers; defendant, among others, withdrawing. A member of the brokers' society sustained loss through embezzlements by an employé; the dates when the various amounts were taken being ascertainable. *Held*, that defendant was not relieved from liability to plaintiff on the theory that the total amount embezzled while defendant was a coinsurer did not equal 333,333 francs, which had to be taken before liability attached under the policy issued by plaintiff; the uninsured portion of the loss being properly deducted once for all from the total loss when ascertained and as of the date of its ascertainment, and each successive reinsurer benefiting by such deduction in proportion to the total amount embezzled during the time he was on the policy.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1817; Dec. Dig. § 684.*]

3. INSURANCE (§ 679*)—REINSURANCE—CONSTRUCTION OF POLICIES.

The rule that rights under a plain contract are to be enforced, however unwise the agreement may appear to be, and that general terms and phrases will be construed in the light of the circumstances surrounding the parties. applies to reinsurance contracts.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1811, 1812, 1818, 1819; Dec. Dig. § 679.*]

4. INSURANCE (§ 686*)—REINSURANCE—LIABILITY OF REINSURER.

An insurer may recover from a reinsurer before the former has actually paid the insured.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1823; Dec. Dig. § 686.*]

At Law. Action by the French Mutual General Society of Mutual Insurance Against Theft against the United States Fidelity & Guaranty Company of Baltimore City. Verdict for plaintiff.

Hyland P. Stewart and Warren A. Stewart, both of Baltimore, Md., for plaintiff.

Bartlett, Poe, Claggett & Bland, of Baltimore, Md., for defendant.

ROSE, District Judge. The plaintiff is a French, the defendant a Maryland, corporation. There was, and doubtless still is, in Paris a body corporate styling itself Société d'Assurances Mutuelle des Agents

de Change de Paris. For brevity, it will be called the Brokers' Society. It had some 70 members. It insured each of them against three-fourths of the loss, not exceeding in any one case 1,333,333 francs, suffered by him from the theft or embezzlement of his employés. Three-fourths of the maximum sum insured against amounted to 1,000,000 francs. To pay so much would unduly tax the resources of the Brokers' Society. It protected itself by reinsurance against any liability, exceeding in a single case a quarter of a million francs. As it was bound for only three-fourths of what was wrongfully taken, it could not be called upon to pay as much as that amount, unless the sum abstracted reached at least 333,333 francs. It therefore did not want any reinsurance against the consequences of embezzlement not exceeding the last mentioned amount, and then only as against its liability for the excess thereover. Such excess could not exceed the difference between a quarter of a million francs and its own maximum liability of 1,000,000 or 750,000 francs. To secure this reinsurance, it entered into negotiations with the plaintiff. It seemingly did not feel that the latter was by itself financially able to give it all the protection needed. It insisted that 90 per cent. of the risk to be assumed by the plaintiff should be reinsured in other companies approved by it, the Brokers' Society. Plaintiff communicated with other insurers, including the defendant. It found that it could effect reinsurances to the desired extent. On March 13, 1903, the plaintiff, by a policy bearing that date, reinsured the Brokers' Society for five years against the excess over a quarter of a million francs, and not exceeding three-fourths of a million, for which the latter might become liable on any one embezzlement. The policy covered only sums taken and discovered during its continuation. It provided that, in case of successive or continuous thefts, the guarantee should not be retroactive, but should apply only to those committed from and after its date. The Brokers' Society retained the right alone to direct the investigation and settlement of the losses. Its decisions in such matters were to be obligatory upon the plaintiff. The latter had no right to refuse or delay the payment of its proportion of the indemnity paid or to be paid by the Brokers' Society. At the end of the five years for which the policy was made, it was to be renewed by tacit agreement, unless either party had given six months previous notice by registered mail of a contrary desire. It was provided that the policy could not be canceled, unless the aggregate amount of losses of the year exceeded the premium. The latter was to be at the rate of 38,000 francs a year payable annually. The plaintiff bound itself to provide three reinsurers acceptable to the Brokers' Society. Such reinsurers were in the aggregate to become liable for at least 90 per cent. of the risk assumed by the plaintiff. They were to countersign the policy and to accept its articles. The plaintiff remained, however, always liable for the full performance of the entire contract. For a consideration of the annual payment of 7,600 francs, less than 10 per cent. for the benefit of the plaintiff, the defendant, on the same day and apparently at the foot of the policy, reinsured two-tenths of the risks assumed by the plaintiff. It was provided that such risk was assumed according to the conditions and usages of Paris in matters of rein-

surance. Four other companies in varying proportions reinsured. in the aggregate seven-tenths of the plaintiff's risk. The transaction had a distinctly international flavor. The headquarters of the plaintiff were at Paris; of the defendant at Baltimore; of the other reinsurers at Munich, Zurich, Vienna, and Brussels, respectively. About January 1, 1906, the plaintiff allowed the Vienna Company to cancel its policy as of that date. A Berlin corporation took the vacated place. The defendant decided to wind up its business in France. It canceled such of its outstanding French risks as it could. It asked the plaintiff to accept a cancellation of the particular one in question. Plaintiff consented. On the 19th of January, 1906, it was agreed that the defendant's contract of reinsurance should terminate as of March 13, 1906, that is, at the expiration of precisely three years after it was entered into. This cancellation was made and accepted "subject to losses incurred prior to said date (March 13, 1906) in case they be known and declared afterwards in conformity to the conditions of the contract" between the plaintiff and the Brokers' Society. The defendant received and retained three full annual premiums. The Berlin Company, which had previously taken over the 5 per cent. of the risk originally reinsured by the Vienna Company, now assumed defendant's place, and, in consideration of the same annual premium, became bound from the date of defendant's retirement for two-tenths of the plaintiff's risk. On March 13, 1907, the Brussels Company was allowed to retire. The plaintiff itself assumed the 2½ per cent. previously carried by it. On March 18 or 19, 1907, it was discovered that a trusted employé of one of the insured members of the Brokers' Society had embezzled large sums from his employer, and had committed suicide. The amount of his defalcation was ascertained to be 669,274.90 francs. Interest on such sum amounted to 13,564.55 francs. The total claim presented by the broker was therefore 682,839.45 francs. Plaintiff disclaimed liability for interest.

Of the principal sum embezzled the
| | |
|---|---|
| original sufferer was liable for one-fourth...................... | $167,318 72 |
| The Brokers' Society for...................................... | 250,000 00 |
| The plaintiff for the balance................................. | 251,956 18 |
| Total ........................................................ | $669,274 90 |

Plaintiff, however, was hopeful of recovering through the broker a salvage of 35,000 francs. It accordingly in the first instance admitted immediate liability for 216,956.18 francs only. This last mentioned sum was 32.4166 per cent., of the broker's total loss. It was possible to determine the date at which the dishonest employé had taken each particular sum. There was, therefore, no difficulty in arriving at the total amount stolen during the period in which the reinsurance group remained as at first constituted, and the amount which was abstracted during each subsequent period in which there was no change in the reinsurers existing at the beginning of the period. The method of adjustment .adopted by the plaintiff was to hold each group of insurers liable as a whole for 32.4166 per cent. of the amount embezzled during the time such group remained unchanged, and then to

apportion the sum so ascertained among the insurers in proportion to the share of the risk they had for that period assumed. Thus the amount embezzled during the time for which the defendant was one of the coinsurers was 301,185.90 francs. Thirty-two and four thousand, one hundred and sixty-six ten thousandths per cent. of such sum amounted to 97,834.228 francs. The defendant was bound to pay one-fifth of the losses incurred while it was reinsurer. One-fifth of the total loss so determined was 19,526.842 francs. All the coinsurers other than the defendant finally acquiesced in this method of adjustment, and made the payments called for by it. The two who, like the defendant, had canceled their policies before the loss was discovered, did so reluctantly, and only after suit had been brought or threatened against them. Defendant denied its liability, and refused to pay anything. The plaintiff brought suit against it before the Tribunal of Commerce of the Department of the Seine sitting at Paris, and there by default obtained a judgment for the amount claimed, viz., 19,526.842 francs. Upon this French judgment this suit was originally brought in this court. There was difficulty in settling the pleadings. There were several hearings thereon. In the end a stipulation was made that all errors of pleading should be waived; that the plaintiff should be entitled to recover, if at all, upon any cause of action it might have against the defendant without regard to pleadings; and that the defendant should be entitled to set up any defense it might have without reference to forms of actions or pleas. A jury trial was waived by both parties, and the cause came on to be heard before the court sitting as a jury. At the close of the evidence the defendant offered three prayers; the plaintiff none.

[1] By the defendant's first prayer the court was asked to rule as a matter of law that upon the uncontradicted evidence the French judgment was a nullity. I grant this prayer. The uncontradicted testimony as to the French law proved that no proper service had ever been made upon the defendant in France.

[2] The defendant's second prayer sets up the most important contention in the case. That prayer asks me to rule, in effect, that the defendant is not liable at all because the total amount embezzled during the period for which it was a coinsurer did not equal the 333,-333 francs which had to be taken before liability attached under the original policy issued by the plaintiff to the Brokers' Society. It contends that on the 13th of March, 1906, when the cancellation of its policy became effective, the total amount of the embezzlement was only 301,185.90 francs. If such loss had been then discovered, the plaintiff would not have been liable for anything to the Brokers' Society, and therefore no liability could have attached to the defendant. The plaintiff says that this contention is unsound. In its view the obligation originally assumed by it to the Brokers' Society was in point of time undivided. When a loss was discovered, the broker's one-fourth was to be determined as of that date, and it was then that the 250,000 francs were to be met by the Brokers' Society. Such deductions it claims were not, and could not be, properly made or considered until the loss was known. The defendant, by the terms of

its cancellation agreement, was not discharged from liability in any and all events. It still expressly remained bound for losses incurred prior to March 13, 1906, in case they became known and were declared afterwards in conformity to the conditions of the contract between the plaintiff and the Brokers' Society. From plaintiff's standpoint the defendant as to losses so incurred remained liable to the same extent as the company that took its place was for losses thereafter incurred, with the same right to share in the benefits of the deductions of the amounts for which the broker and the Brokers' Society were liable. It calls attention to the fact shown by the evidence that, when the defendant's contract was canceled, defendant retained the full annual premium for the time during which it was upon the policy. The company which took defendant's place received compensation at the same annual rate.

The difficulty is in determining how, under the special circumstances of this case, the benefit of the exemption from liability from at least 333,333 francs of any one embezzlement affects the obligation of successive reinsurers. The contract is French. By its express terms it is to be governed by the usage of Paris in matters of reinsurance. It follows that the French law controls if there is any such applicable law, and, if not, it is regulated by the custom of Paris if such custom exists. Experts in the French law and in the insurance practices of Paris have been examined. They do not in my judgment profess to state what the law of France or the usages of Paris on this matter are. The witnesses express their individual opinion as to what that law should be declared to be whenever the courts of France are called upon to make a declaration upon the subject, or as to what should be the usage of Paris, whenever any usage upon the subject shall be established.

Sitting as a jury, I find as a matter of fact that it is not proved that there is any applicable French law or custom. The learned and diligent counsel for the respective parties have not been able to find that the precise question now under consideration, or any one having any marked analogy to it, has ever been passed upon in any reported case. My own researches and inquiries have had the same negative result.

There are at least three possible theories which may be adopted:

First. That the uninsured portion of the loss shall be deducted once for all from the total loss when ascertained and as of the date of its ascertainment, and that each successive reinsurer shall benefit by such deduction in proportion to the total amount embezzled during the time he was on the policy. This is the contention of the plaintiff.

Second. That each insurer shall have the full benefit of the total deduction to the extent of at least 333,333 francs. This theory treats each contract of reinsurance as complete in itself, and as having no privity or connection with that which went before it or that which may come after it. Each of such contracts is given its most strictly literal interpretation. A reinsurer has nothing to do with any sums embezzled before it assumed the risk or with any that may be embezzled after its policy was canceled. It is bound only for its share

of the liability of the plaintiff during the time it is a reinsurer of the plaintiff. The plaintiff, however, is not liable at all, unless the sum embezzled exceeds 333,333 francs. A reinsurer, therefore, cannot be called upon to pay, unless the amount taken during the term its policy was in force exceeded that sum. If this theory is sound, the defendant is not liable. It, however, does not make this contention. The parties could not have intended that their rights and liabilities should be determined in this way. That the Brokers' Society as well as the plaintiff should be protected by reinsurance to the extent of 90 per cent. of the risk assumed by the latter was of the very essence of the whole scheme and of all the transactions connected with it. If each successive reinsurer could successfully assert that he was liable for nothing more than his share of the amount by which the sum embezzled during the time he was on the policy exceeded 333,333 francs, it might well have happened that, although the plaintiff would be liable for a large sum, it would not be entitled to collect any, or at the most a small, part of its loss from its reinsurers. Three hundred and one thousand francs were embezzled, while the defendant was on the policy; 368,000 francs afterwards. According to the theory now under discussion, defendant would not be liable at all, for the amount embezzled while it was a reinsurer was less than 333,333 francs. Its successor's liability would be worked out as follows:

Sum embezzled while successor was a reinsurer.............. 368,000 francs
The broker bears one-fourth of which...................... 92,000   "
The Brokers' Society...................................... 250,000   "
                                                           --------
Balance, for two-tenths of which reinsurer would be liable... 26,000   "

The net result would be that, while the plaintiff is liable for nearly a quarter of a million of francs, it would have had reinsurance for not much more than one-tenth of that sum. Had there been three successive reinsurers of the same portion of the risk, it might have found itself without any reinsurance. The consequences to which this theory leads are so manifestly fatal to the whole purpose of everything which the parties did that it may be rejected without further consideration.

The defendant takes its stand upon what may be called the third theory. This assumes that, while the broker's one-fourth and the Brokers' Society's 250,000 francs can be deducted but once, they are, when the loss is finally discovered, to be treated as if such deductions had been made from day to day, or from period to period as the money was actually taken. Each successive reinsurer becomes bound for its share of the liability which attached to the plaintiff during the time it was upon the policy. As applied to the facts of this case, the defendant was never liable because when its policy was canceled, as was discovered, when the embezzlement took place, the amount taken was not sufficient, had the plaintiff's own policy then terminated, to impose any liability upon the latter. During the five days over a year that its successor, the Berlin company, was on the policy of reinsurance, the broker's clerk kept on stealing, and as a consequence during this period, and during this period only, the plaintiff's liability attached. For its

share of whatever liability came upon the plaintiff while it was a co-insurer the Berlin company was liable.

Which of these theories is the one which the court should adopt? If the language of the contract between the plaintiff and the defendant plainly points to one of them, the discussion is closed. Like other contracts of insurance, it is "to be construed according to the sense and meaning of the terms which the parties have used." Insurance Co. v. Coos County, 151 U. S. 463, 14 Sup. Ct. 379, 38 L. Ed. 231.

Defendant claims that its position is sustained by the language of the cancellation agreement. Its policy terminated on the date upon which the cancellation took effect "subject only to the losses incurred prior to that date in case they be known and declared afterwards in conformity to the conditions of the contract" between the plaintiff and the Brokers' Society. At the hearing, it was suggested that the phrase, "in conformity to the conditions of the contract," had reference to those provisions of the original agreement by which plaintiff was exempted from liability for a theft which did not exceed 333,333 francs. Obviously, however, the words in question have quite another purpose and significance. In spite of the cancellation, the defendant was to remain liable for losses previously incurred, provided they were known and declared afterwards in conformity with the contract—that is, were known and declared before the expiration of the five-year term of the policy issued by the plaintiff to the Brokers' Society. By that policy the plaintiff did not assume liability for any thefts not discovered and declared during its existence. The reservation in question, therefore, means precisely the same as if it had read, "Subject to losses incurred prior to March 13, 1906 in case they be known and declared on or before March 13, 1908." This language throws little light upon the question at issue. It certainly falls far short of clearly answering it.

The strongest argument in support of defendant's contention is the simple and unquestioned fact that the contract was canceled. The purpose and effect of cancellation was to release it from all responsibility or liability for anything which might happen thereafter. If at the time of the cancellation it was not liable, it could not be made so by anything which might subsequently take place. Doubtless the defendant might expressly have bound itself, in spite of what it and the plaintiff called a cancellation, to answer for certain defaults which might be committed in the future, but in defendant's view the language of the reservation which was actually made does not either by expression or by implication seek to hold it for anything for which it was not at the time of the cancellation liable if all that had then taken place had been then known.

[3] As arguments go, this argument is very strong. Nevertheless, it is impossible to believe that the words used could have been intended to decide in advance the present controversy in favor of the defendant. If the parties had so desired, they could have made such a purpose very plain. The original contract between them shows how careful they could be to make their meaning plain by concrete illustrations. In interpreting contracts, courts seek to put themselves in the place of the parties at the time the bargains between them were made, and

from that viewpoint look at what the parties did and said. Of course, if those who enter into an agreement have expressed themselves plainly, their rights are to be governed by the words they use, no matter how unwise the courts may think one or both of them must have been to have entered into such an agreement. Where, however, they have not closed the controversy by the use of plain and unequivocal language, the courts must construe general terms and phrases in the light thrown upon them by the situation in which the parties were at the time they were used. General as this rule of construction is, many courts of high authority have held that it is peculiarly applicable to contracts of reinsurance. Such agreements are often made on printed blanks intended for other purposes, or, if not, in the making of them the parties are prone to use stock words or phrases having little or no real pertinency to the matter in hand. Philadelphia Life Ins. Co. v. American Life & Health Ins. Co., 23 Pa. 65; Union Ins. Co. v. American Ins. Co., 107 Cal. 327, 40 Pac. 431, 28 L. R. A. 692, 48 Am. St. Rep. 140; Manufacturers' Ins. Co. v. Western Assurance Co., 145 Mass. 419, 14 N. E. 632; South British Fire & Marine Ins. Co., of New Zealand v. Dacosta, L. R. (1906) 1 K. B. 456; Frost on Guaranty Ins. § 37. That contracts of reinsurance should be so interpreted is about the only relevant thing that the adjudged cases have to say as to the question now under consideration. "All the circumstances existing at the time defendant's contract was made and when it was canceled show that the purpose of all the parties was that the plaintiff should, except as to about 10 per cent. of its undertaking, be fully reinsured during the entire five years, and that, when cancellation was permitted, another reinsurer was at once to step into the place of the one who retired. Every one acted upon the assumption that there was no difference between the risk assumed by one who was a reinsurer during the first portion of the five-year period and one who was a reinsurer during the latter part of it.

The Brokers' Society paid the plaintiff an annual premium of 38,000 francs. Plaintiff retained 10 per cent. of this as a compensation for the general responsibility accepted by it, and perhaps in some part as brokerage for getting the business for the other companies. The balance of 34,200 francs it divided among the reinsurers in the exact proportion to the percentage of the risk assumed by each of them and the time the policy of each remained in force. Thus the defendant assumed two-tenths or one-fifth of the risk. The annual premium in each of the three years its policy remained in force was two-tenths of 34,200 francs, or 6,840 francs. When the policy was canceled, it did not return any part of this sum, nor was it asked to. Its successor was offered and accepted the same annual premium. To everybody it appeared that the risk of being a reinsurer for the last two years of the original five was no greater than that of being a reinsurer for the first three. Obviously, however, if the defendant's present contention is sound, there was a great difference. The reinsurer for the earlier priod had the full benefit of the broker's one-fourth and the Brokers' Society's 250,000 francs, so far as they were necessary for its complete exoneration. All that remained available for the protection of its successor was so much of these, if any, as it did not need for its

own. At the time nobody acted as if there was any difference whatever in the risk assumed. Such fact is strongly persuasive evidence that at that time no one intended that any such difference should be made.

The first of the three possible theories of adjusting the loss among successive reinsurers, therefore, seems to have been that which was in contemplation of the parties. It is a perfectly simple and logical theory. It requires nothing further than the assumption that the parties intended that the sum to be borne by the broker himself and by the Brokers' Society should not be deducted until the total loss was ascertained, and then from the total loss. Obviously that is the only time at which the broker's one-fourth could as against him be calculated. To my mind as applied to the facts of this case, it is far the most equitable of the three possible theories. It contravenes no positive rule of law. So far as I am aware, there is not a single authority opposed to it, although it is equally true that there is none in its favor. The defendant's second prayer will accordingly be refused.

It will be remembered that the plaintiff did not at first pay 35,000 francs of the portion of the loss for which it was liable hoping that such sum could be recovered as salvage. It finally made an adjustment by which it received credit for 15,000 francs in lieu of such claim for salvage. It accordingly paid the Brokers'' Society an additional 20,000 francs. It claims from the defendant 1,776 francs as the latter's share of this 20,000 francs.

[4] Defendant's third prayer asks me to rule as a matter of law that the plaintiff cannot recover this sum in this action because plaintiff did not pay the 20,000 francs until after this suit had been brought. The authorities, however, are clear that an insurer may recover from a reinsurer before the former has actually paid the insured. Defendant's third prayer is therefore refused. Allemannia Ins. Co. v. Firemen's Ins. Co., 209 U. S. 332, 28 Sup. Ct. 544, 52 L. Ed. 815; note to Traders' Ins. Co. v. Aachen & M. T. Ins. Co., 8 L. R. A. (N. S.) at pages 857, 858; Norwood v. Resolute Fire Ins. Co., 47 How. Prac. 43; Gantt v. American Central Ins. Co., 68 Mo. 503. The result is that a verdict will be entered in favor of the plaintiff for the sum of $5,339.70, of which $4,974.74 represents the 19,526,846 francs paid by the plaintiff for the defendant's share of the coinsurance before the institution of this suit, and interest thereon from the time of such payment to the day of trial and $364.96 represents the 1,776 francs subsequently paid, with interest thereon from the date of payment to the day of trial.